# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

TIMOTHY ALVES,

     Plaintiff,

     vs.

UNITED STATES OF AMERICA,
DEPARTMENT OF THE ARMY, ARMY
CORPS OF ENGINEERS, WALLA WALLA
DISTRICT,

     Defendant.

Case No.: 3:19-cv-00044-REP

**MEMORANDUM DECISION AND
ORDER RE: DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

**(Dkt. 59)**

---

Pending is Defendant's Motion for Summary Judgment (Dkt. 59). All parties have

consented to the exercise of jurisdiction by a United States Magistrate Judge. Dkt. 15. For the

reasons stated below, the Court will deny the motion as to Plaintiff's failure to maintain claim

and will grant the motion as to Plaintiff's failure to inspect and failure to warn claims.

## BACKGROUND

**A.      The Lease**

The Dworshak State Park is a public recreation area that spans 850 acres along the

western shore of the Dworshak Reservoir in Clearwater County, Idaho. *See* Def.'s Stmnt of

Facts ¶¶ 1, 3 (Dkt. 59-2).[1] Dworshak State Park offers several recreational opportunities

including Big Eddy Marina. *Id.* ¶ 3.

The land on which Dworshak State Park is located is owned by the Department of the

Army. *Id.* ¶ 3. In 1996, the Army Corps of Engineers (the "ACOE"), on behalf of the Secretary

of the Army, executed a 25-year lease (the "Lease") with the Idaho Department of Parks and

---

[1] Unless otherwise noted, all the factual citations are to undisputed facts.

**MEMORANDUM DECISION AND ORDER - 1**

Recreation ("IDPR").  *Id.*  The Lease called for IDPR to operate and maintain Big Eddy Marina and other parts of Dworshak State Park for the benefit of the United States and the general public.  *Id.* ¶ 5.  The Lease contained various provisions regarding safety, insurance, and maintenance.  Lease at 55-56, 57-58, 65 (Dkt. 25-11).

The most critical portions of the Lease can be found at Paragraph 44, which divides operation and maintenance responsibilities for Big Eddy Marina.  *Id.* at 65.  According to this part of the Lease:

a.  The lessee [IDPR] will be responsible for day-to-day operation and maintenance of the docks and fuel barge.  This will include maintenance of walk ramps, decking, boat bumpers, inspection, tightening, and replacement of bolts and other above-water elements of the system, as well as adjusting the docks and fuel barge as needed due to the fluctuation of the reservoir level.  The lessor [ACOE] will conduct periodic inspections to determine if the lessee is performing the required maintenance.

b.  The lessor [ACOE] will be responsible for maintaining the structural integrity of the docks and fuel barge.  This will include such things as all of the below-water elements of the docks, <u>winch system</u>, flotation, trusses, anchoring system and below the deck surface of the fuel barge.

c.  The lessor will be responsible for major repairs and/or replacement of the docks and fuel barge as a result of design deficiencies or acts of nature that exceed $5,000 per occurrence.  The lessee will be responsible for the initial $5,000 per occurrence.  The lessor will not be responsible for cumulative minor repairs that exceed $5,000 or for lack of required routine maintenance or negligence by the lessee.

*Id.* (emphasis added).  Relevant here, the ACOE, not the IDPR, retained ownership of the facilities at Big Eddy Marina, including the winch system underscored above.  Pl.'s Stmnt of Facts ¶ 5 (Dkt. 60-1); Lease at 65 (25-11).

The winch system is comprised of eight winches.  Def.'s Stmnt of Facts ¶ 4,  (Dkt. 59-2).  Two of the winches are on land, four are on docks, and two are on platforms in the water that are connected to anchors.  *Id.*  The purpose of the winch system is to equilibrate the docks at Big

Eddy Marina and the water level in the reservoir, as the water level can fluctuate multiple feet a day.  *Id.*

**B.     Plaintiff's Injuries**

In 2015, Plaintiff Timothy Alves was hired by the Idaho Department of Parks and Recreation ("IDPR") to work as a seasonal maintenance aide at Dworshak State Park.  Def.'s Stmnt of Facts ¶ 13 (Dkt. 59-2).   One of Mr. Alves's duties as a maintenance aide was to adjust the docks at Big Eddy Marina using the eight-winch system.  *Id.* ¶¶ 4, 18.

When Mr. Alves began working for IDPR, he was trained on how to operate the winch system by IDPR's then park manager, Michelle East.  *Id.* ¶¶ 14-16.  This training included a demonstration of how to use the winch and supervised practice using the winch.  *Id.* ¶ 14.  During the training process, Mr. Alves was warned that the winch system was dangerous.  *Id.* ¶ 17.  Ms. East only allowed him to begin using it on his own when she was satisfied that he could operate the system safely.  *Id.* ¶ 15.   Once he had been trained, Mr. Alves regularly used the winch system to adjust the docks during his shifts at Dworshak State Park.  *Id.* ¶ 18.

On August 15, 2016, as was usual, Mr. Alves arrived at work around 7:00 a.m. and adjusted the winches at Big Eddy Marina.  *Id.* ¶ 19.  Mr. Alves next drove to another part of the Park, the Three Meadows Group Camp, where he performed other maintenance duties.  *Id.*  At the end of the day, Mr. Alves and other IDPR employees boated back to Big Eddy Marina to adjust the winches before leaving for the day.  *Id.*

The first winch the group adjusted was one of the winches floating out on the water.  An IDPR employee who was not Mr. Alves adjusted that winch.  *Id.*  The group then headed to the docks, where they left the boat and Mr. Alves walked to one of the winches on the land: Winch No. 1.  *Id.* ¶ 20.  This winch is located high above the docks and has a cable that extends out to

**MEMORANDUM DECISION AND ORDER - 3**

the docks in Big Eddy Marina.  The winch is behind a chain that has a caution sign and has a

locked chain going through the winch to prevent unauthorized persons from operating it.  *Id.*

Normally, the cable heading from Winch No. 1 to the docks has some slack in it.  *Id.* ¶

21.  On that day, however, Mr. Alves noticed that the cable was unusually taught.  *Id.*  Mr. Alves

unlocked the chain going through the winch and disengaged the brake.  *Id.*  Once the brake was

released, the handwheel on the winch began rapidly spinning and Mr. Alves's hand somehow[2]

got caught in the handwheel.  *See* Def.'s MSJ at 3 (Dkt. 59-1); Pl.'s Amended Compl. ¶ 18 (Dkt.

24); Passamaneck Rpt. at 1 (Dkt. 60-2).  As a result of this accident, Mr. Alves suffered serious

injuries to his left hand, arm, and shoulder, including the amputation of this hand.  Def.'s MSJ at

9 (Dkt. 59-1); Pl.'s Amended Compl. ¶ 18 (Dkt. 24).

## C.    Plaintiff's Federal Claims

In his Amended Complaint, Plaintiff alleges that the ACOE's negligence in maintaining,

inspecting, and warning about the winch caused the accident that injured his left arm and hand.[3]

Pl.'s Amended Compl. ¶¶ 15-16, 20 (Dkt. 24).  The Amended Complaint, however, does not

identify exactly how Plaintiff believes Defendant was negligent in each of these areas.

---

[2] The evidence contains a factual dispute over how exactly Mr. Alves's hand became stuck in the
spinning wheel.  One eyewitness to the accident reports that he saw Mr. Alves "instinctively"
reach through the spinning wheel for the winch brake handle, thereby putting his hand into the
spokes of the handwheel.  Stmnt of Randall Rausin at 2 (Dkt. 59-8).  Consistent with this
account, Ms. East, the former park manager, avers that she spoke with Mr. Alves after the
accident "on more than one occasion," and that he told her that "he panicked when the winch
was free-spooling and that he reached through the handwheel in an attempt reach the brake."
East Dec. ¶ 6 (Dkt. 59-12).  Mr. Alves, by contrast, testifies that his left hand was resting on the
top of the wheel when it started spinning and that his hand "got carried through somehow."
Alves Depo at 71:1-72:13 (Dkt. 59-4).

[3] The Amended Complaint also contains a defective design claim.  Pl.'s Amended Compl. ¶ 19
(Dkt. 24).  The Court dismissed this claim, however, following a motion to dismiss.  3/31/21
MDO at 12-16 (Dkt. 46).  Plaintiff is no longer asserting that the design of the winch contributed
to the accident.  *See* Passamaneck Rpt. at 5 (Dkt. 60-2).

**MEMORANDUM DECISION AND ORDER - 4**

At oral argument, Plaintiff's counsel provided much needed clarification on this point. Specifically, at the December 21, 2021 hearing, Plaintiff's counsel identified Plaintiff's remaining theories of negligence as follows: (i) Defendant failed to maintain the winch system as required by Paragraph 44(b) of the Lease, (ii) Defendant failed to conduct sufficient inspections to ensure that IDPR was meeting its maintenance obligations under Paragraph 44(a) of the Lease, and (iii) Defendant violated its duty of care as the owner and lessor of the winch system to adequately warn of the dangers associated with the winch.[4]

In bringing these claims, Plaintiff recognizes that he can only recover damages related to the ACOE's own negligence. *See* Pl.'s Rsp at 7 (Dkt. 60). Plaintiff has not filed any claims against the United States based on IDPR's negligence, and Plaintiff acknowledges that Defendant is not vicariously liable for any such negligence. *Id.*

## <u>SUMMARY JUDGMENT STANDARD</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. at 252.

---

[4] Plaintiff previously identified two other potential bases for his negligence claims, ACOE manuals EM 385-1-1 and EM 1110-1-400. Rsp. to MTD at 3-9 (Dkt. 30). In the response to the motion to dismiss, Plaintiff contended that these manuals imposed non-discretionary duties on Defendant regarding how to test, inspect, and post warnings on the winch. *Id.* When the Court asked about these manuals at the motion hearing, Plaintiff indicated that he was no longer pursuing these theories of relief. The Court accepts that concession and will treat these theories as abandoned.

**MEMORANDUM DECISION AND ORDER - 5**

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id*. at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)).  The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## THE DISCRETIONARY FUNCITON EXCEPTION

The Federal Tort Claims Act (the "FTCA") provides a waiver of the United States' sovereign immunity for torts committed by governmental employees "under circumstances where the United States, if a private person, would be liable to the claimant."  28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674.  The FTCA, however, contains statutory limits to that waiver of sovereign immunity to include where the government is performing a "discretionary function."  This exception immunizes the United States against:

> [a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  Stated another way, the Government allows itself to be sued for ordinary common-law torts committed by its employees when they act negligently, but does not allow itself to be sued for the policy decisions of its employees when they act negligently or abuse their discretion. *See Dalehite v. United States*, 346 U.S. 15, 29-30 (1953) (citing legislative history of the discretionary function exception).  Indeed, the purpose of this exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social,

**MEMORANDUM DECISION AND ORDER - 6**

economic and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

The Supreme Court has adopted a two-part test for determining when the discretionary function exception applies.  First, the court must consider if the challenged action is a matter of choice.  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  An action expressly prescribed by a "federal statute, regulation, or policy" is not discretionary and failures to comply with such mandates are not shielded by the exception.  *Id.*  Second, if an action is optional, the court must consider whether the challenged action "is of the type Congress meant to protect – that is, whether the action involves a decision susceptible to social, economic, or political policy analysis."  *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).  Such policy judgments are protected from "exposure to suit by private individuals."  *Berkovitz,* 486 U.S. at 536.

It is the government's burden to demonstrate the applicability of the exception under this two-prong test.  *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1995).

## THE ELEMENTS OF A TORT CLAIM

Once issues of immunity, if any, have been resolved, the scope of the United States' liability under the FTCA is determined by reference to state law.  *Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013); *see also Bailey v. United States*, 623 F.3d 855, 861 n.2 (9th Cir. 2010) ("after [the court] determine[s] as a matter of federal law that the discretionary function exception does not apply . . . [the court] then evaluate[s] whether the government can be held liable under the laws of the state where the act or omission took place").

In Idaho, a negligence claim consists of four elements: "(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a

causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss

or damage." *Forbush v. Sagecrest Multi Family Prop. Owners' Ass'n*, 162 Idaho 317, 322

(2017).  The first of these elements – the existence of a duty of care – is generally a question of

law for the Court to decide.  *Id.*

Determining whether such a duty exists is guided by the following basic principles.  First,

"every person, in the conduct of his business, has a duty to exercise ordinary care to prevent

unreasonable, foreseeable risks of harm to others."  *Rountree v. Boise Baseball*, LLC, 154 Idaho

167, 171 (Idaho 2013).  Second, absent a special relationship between the parties, "the law

generally does not impose affirmative duties to protect or assist."  *Oswald v. Costco Wholesale

Corp.*, 167 Idaho 540, 550 (Idaho 2020); *see also Udy v. Custer County*, 136 Idaho 386, 389

(Idaho 2001) (explaining that people generally owe "no affirmative duty to act to assist or protect

another absent unusual circumstances, which justify imposing such an affirmative

responsibility").

It is the plaintiff's burden to establish a duty of care according to these principles and

accompanying case law.  *Reynolds v. American Hardware Mut. Ins. Co.*, 115 Idaho 362, 371

(Idaho 1988).  A plaintiff may satisfy this burden by relying on traditionally recognized sources

for a duty of care, such as premises liability, or by independently establishing a duty based on the

facts of the case.  *See Dupuis v. E. Idaho Health Servs.*, 485 P.3d 144, 152 (Idaho 2021).

### DISCUSSION

**A.    Defendant's Individual Legal Challenges to Plaintiff's Claims**

1.    *Plaintiff's Failure to Maintain Claim*

The first of Plaintiff's three remaining claims is that Defendant negligently failed to

perform its maintenance obligations under Paragraph 44(b) of the Lease.  The headings of

Defendant's argument section suggest that Defendant is asserting sovereign immunity against *all*

**MEMORANDUM DECISION AND ORDER - 8**

of Plaintiff's claims, including this claim.  *See* Def.'s MSJ at 12 (Dkt. 59) (stating that "The Discretionary Function Exception to the FTCA Applies and, Accordingly, the United States has Sovereign Immunity").  But this is a misnomer.

In the body of its argument and introduction, the government never contends that complying with its maintenance obligations under Paragraph 44(b) of the lease was discretionary or susceptible to policy considerations.  It is clear from both the briefing and oral argument that this is not Defendant's position.  For example, at the motion hearing, the counsel for Defendant acknowledged that Defendant would be liable for Plaintiff's injuries if Plaintiff's injuries were caused by Defendant's failure to maintain items Defendant believes are covered by Paragraph 44(b) of the Lease, such as the below-water elements of the docks.  In making this point, Defendant conceded that failure to perform its direct maintenance obligations under Paragraph 44(b) of the Lease, whatever those obligations may be, is not a discretionary function, no doubt because the failure to maintain one's own property resulting in injury – whether it be a driveway or here, a dock – rings of ordinary common-law tort, not policy decision.  The Court agrees.  *See Whisnant*, 400 F.3d at 1184 (citing numerous cases holding that government negligence in the maintenance of its own property is not shielded by the discretionary function exception).  Plaintiff's failure to maintain claim, consequently, is not barred by the discretionary function exception.

Defendant's motion for summary judgment on this claim rests on much narrower grounds.  The true thrust of Defendant's attack on Plaintiff's failure to maintain claim is not that Defendant had absolutely no duties to Plaintiff under the Lease or that it has immunity from liability on this claim, but that Defendant's duties under Paragraph 44(b) of the Lease did not encompass maintenance of the winch that injured Plaintiff.

**MEMORANDUM DECISION AND ORDER - 9**

The Lease that governs the operation of Big Eddy Marina divides the responsibility for maintaining the docks between Defendant and IDPR.  Lease at 65 (Dkt. 25-11).  Paragraph 44(a) of the Lease outlines IDPR's obligations as follows:

> The lessee will be responsible for day-to-day operation and maintenance of the docks and fuel barge.  This will include maintenance of walk ramps, decking, boat bumpers, inspection, tightening, and replacement of bolts and other above-water elements of the system, as well as adjusting the docks and fuel barge as needed due to the fluctuation of the reservoir level.

*Id.*  Paragraph 44(b) of the Lease confers inverse responsibilities on Defendant.  Specifically, the Lease provides that:

> The lessor will be responsible for maintaining the structural integrity of the docks and fuel barge.  This will include such things as all of the below-water elements of the docks, winch system, flotation, trusses, anchoring system and below the deck surface of the fuel barge.

*Id.*

Defendant reads Paragraphs 44(a) and 44(b) of the Lease as drawing a distinction between above-water and below-water maintenance, with IDPR responsible for the former and Defendant responsible only for the latter.  Def.'s MSJ at 3, 5-6 (Dkt. 59-1); *see also* Def.'s Stmnt of Facts ¶ 6 (Dkt. 59-2).  Plaintiff disagrees.  *See* Pl.'s Stmnt of Facts at 2 (Dkt. 60-1).

"When interpreting a contract, [the] [c]ourt begins with the document's language." *River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 599 (Idaho 2020) (quoting *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (Idaho 2010)).  If this language is unambiguous, the Court will "construe" the meaning of the contract as a matter of law, reading the contract "in its plain, ordinary and proper sense." *Id.*  If, however, the contract is ambiguous, interpretation of the contract becomes a factual issue to be decided by the trier of fact. *Lamprecht v. Jordan, LLC*, 139 Idaho 182, 185 (Idaho 2003).  "A contract is ambiguous if it is reasonably subject to conflicting interpretations." *Id.*

**MEMORANDUM DECISION AND ORDER - 10**

Defendant has not shown that it is entitled to judgment as a matter of law under these standards.  Defendant's reading of the Lease rests heavily on the second sentence of Paragraph 44(b).  Defendant insists that this sentence restricts Defendant's responsibility for maintaining the winch system to the system's "below-water elements."  Def.'s MSJ at 5-6 (Dkt. 59-1).  But this is an extrapolation.  The sentence itself reads: "This [Defendant's responsibilities under the Lease] will include such things as all of the below-water elements of the docks, winch system, flotation, trusses, anchoring system and below the deck surface of the fuel barge."  Lease at 65 (Dkt. 25-11).  Defendant's understanding of this sentence depends on two debatable assumptions.

First, Defendant presumes that the phrase "below-water elements of" modifies all the examples listed in the above sentence.  This is not self-evident.  For example, Defendant's reading results in the ungainly conclusion that "the below-water elements of" modifies the "below the deck surface of the fuel barge."  A reasonable reader could decide that this was not the best reading of the sentence and that the phrase "below-water elements of" only applies to the docks, not the other items.

Second, and more problematically, Defendant's reading of the Lease elevates the second sentence of Paragraph 44(b) over the first.  Specifically, Defendant presupposes that, if the non-exhaustive examples in the second sentence of Paragraph 44(b) focus on below-water maintenance, that must be because Defendant's responsibilities are limited to such maintenance.  This does not necessarily follow.  It is the first, not the second, sentences of Paragraphs 44(a) and 44(b) that define and assign the differing maintenance responsibilities of Defendant and IDPR.  According to these sentences, IDPR controls the "day-to-day operation and maintenance of the docks and fuel barge," while Defendant retains the duty to maintain "the structural integrity" of these *same* areas.  Lease at 65 (Dkt. 25-11).  These sentences make no mention of the waterline

(a physical boundary).  This strongly suggests that the division of labor under the Lease is not

locational, but depends instead on whether the maintenance is routine or structural in nature.[5]

At the December 21, 2021 motion hearing, the Court gave Defendant an opportunity to

rebut to these points.  Counsel for Defendant responded by admitting that the wording of the

Lease was not the most felicitous.  Counsel argued, however, that IDPR and Defendant – the two

parties to the lease – interpreted the Lease in the manner Defendant proposes.  As support for this

position, Counsel pointed to the December 23, 2019 Declaration of Paul J. Pence, a U.S. Army

Corps of Engineers Natural Resources Manager.[6]  In relying on this Declaration, Defendant is, in

effect, asking the Court to resolve ambiguities in the language of the Lease, a factual question,

through the consideration and weighing of evidence outside the Lease.  This is not the Court's

role at summary judgment.  *See Johannsen v. Utterbeck*, 146 Idaho 423, 428 (Idaho 2008)

(ambiguity in the language of a contract "creates an issue of fact precluding summary

judgment").

Here, there are genuine disputes of material facts regarding how to best interpret

Paragraph 44(b) of the Lease.  This provision of the Lease gives Defendant responsibility for

maintaining the "structural integrity" of "the docks and fuel barge."  Lease at 65 (Dkt. 25-11).

These are broad and ambiguous terms.  A reasonable fact-finder could determine that these terms

---

[5] Paragraph 44(c) of the Lease bolsters this reading.  Lease at 65 (Dkt. 25-11).  This Paragraph
clarifies that Defendant bears responsibility "for major repairs and/or replacement of the docks
and fuel barge as a result of design deficiencies or acts of nature that exceed $5,000 per
occurrence," while IDPR is accountable for "initial" repairs of $5,000 or less per occurrence.  *Id.*
The Paragraph further stresses that this division does not impose responsibility on Defendant for
"cumulative minor repairs that exceed $5,000 or for lack of required routine maintenance."  *Id.*

[6] This declaration states: "On the rare occasion that an issue was reported to the U.S. Army
Corps of Engineers regarding the below-water elements of the docks, winch system, or
anchoring system, it assisted in remedying the issue as it has access to equipment needed for
below-water operations."  Pence Dec. ¶ 9 (Dkt. 25-10).

**MEMORANDUM DECISION AND ORDER - 12**

do not encompass any above-water maintenance of the winch system, as Defendant claims.  On the other hand, a reasonable fact-finder could conclude that this provision required Defendant to regularly inspect and replace the winch drum and brake lining, as Plaintiff claims.  A reasonable fact-finder could also reject both parties' preferred interpretation in favor of some middle ground.  For example, a trier of fact, after hearing all the evidence, could decide that Defendant's promise to maintain the "structural integrity" of the docks, included performing certain repairs on the above-water portions of the winch system, for example major or irregular repairs, but did not include the repairs at issue here, namely the regular or routine replacement of winch parts.  Resolving these ambiguities are questions of fact that preclude summary judgment.

2.    *Plaintiff's Failure to Inspect Claim*

The second of Plaintiff's claims is that Defendant negligently failed to perform sufficient inspections to ensure IDPR's was performing its maintenance responsibilities.  This claim is grounded in Paragraph 44(a) of the Lease.[7]  As outlined above, this Paragraph entrusts IDPR to perform the "day-to-day" maintenance of the docks and fuel barge at Big Eddy Marina.  Lease at

---

[7] Some of the language in Plaintiff's supplemental brief confusingly suggests otherwise.  *See* Pl.'s Supp. at 2, 5 (Dkt. 71).  This language improperly conflates Plaintiff's failure to maintain and failure to warn claims.  Since the beginning of the lawsuit, Plaintiff has sought to bring claims against Defendant under both Paragraphs 44(a) and 44(b) of the Lease.  Pl.'s Compl. ¶ 14 (Dkt. 1) and Pl.'s Amended Compl. ¶ 14 (Dkt. 24).  The Court and the parties have consistently referred to the claim brought under Paragraph 44(b), discussed above, as Plaintiff's failure to maintain claim.  *See, e.g.*, 3/31/21 MDO at 7 (Dkt. 46).  This may not be the most precise nomenclature.  Where a party has a duty to perform regular maintenance, that may include a duty to perform the inspections necessary to ensure the maintenance is completed.  In other words, it is theoretically possible for Plaintiff to bring a failure to inspect claim grounded in Paragraph 44(b) of the Lease.  Plaintiff, however, has never clearly articulated such a claim and it is not clear if he is asserting one.  This decision, consequently, expresses no opinion on the timeliness or validity of such a claim.  In this decision, when the Court refers to Plaintiff's "failure to inspect claim" the Court is referring to Plaintiff's separate and long-asserted claim that Defendant failed to conduct sufficient inspections to ensure *IDPR* was satisfying its maintenance obligations under Paragraph 44(a) of the Lease.  *See* 3/31/21 MDO at 7 (Dkt. 46).  This is a very different claim, conceptually speaking, from Plaintiff's claim that Defendant is liable for its own failure to perform maintenance under Paragraph 44(b) of the Lease.

**MEMORANDUM DECISION AND ORDER - 13**

65 (Dkt. 25-11).  Relevant here, the final sentence of Paragraph 44(a) states that Defendant "will conduct periodic inspections to determine if [IDPR] is performing the required maintenance." *Id.*  Plaintiff contends that Defendant negligently failed to perform the inspections contemplated by this sentence.

Defendant raises two challenges to this claim.  First, Defendant argues that because it had discretion over what sort of inspections to perform and how and when it would conduct them, the discretionary function exception bars Plaintiff's claim.  Def.'s MSJ at 15-16 (Dkt. 59-1). Defendant asserted a nearly identical argument in the motion to dismiss, which the Court denied. *See* Def.'s MTD at 11-12 (Dkt. 25-1) and 3/31/21 MDO at 7-10 (Dkt. 46).  While the Court is not bound by that decision, it is not persuaded that the government has identified either new information or convincing reasons to reach a different outcome.  In accordance with *Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001), the Court finds that the discretionary function exception does not apply to this claim.  *Id.* at 1215 (finding that negligent oversight of a contractor was not protected when the government failed to follow its own oversight procedures).

The second attack Defendant lodges against Plaintiff's failure to inspect claim is stronger. Defendant maintains that it did not have a duty *to Plaintiff* to inspect the docks and the Lease did not create such a duty where none previously existed.  *Id.* at 1, 4, 17-18.  In order to fully develop this issue, the Court ordered, and the parties provided supplemental briefing on the relevant Idaho law.  1/25/22 Order (Dkt. 70).  This briefing gave Plaintiff an opportunity to establish why he believes Defendant owed him a duty of care, under Idaho law, to conduct inspections to ensure IDPR was performing its required maintenance.  Plaintiff has not carried this burden.

**MEMORANDUM DECISION AND ORDER - 14**

Plaintiff contends that Defendant had an "independent duty," as the owner of the winch, separate and apart from the Lease, to inspect and maintain the winch. Pl.'s Supp. at 2 (Dkt. 71). Plaintiff does not, however, cite any case law to support this position. Nor does Idaho law support this unnuanced position.

In Idaho, the general rule is that, once property is leased, it is the renter, not the owner, who assumes responsibility for the ongoing maintenance of the property. *See Stiles v. Amundson*, 160 Idaho 530, 533-534 (Idaho 2016) ("[a] landlord generally is not responsible for injuries to third persons in privity with the tenant which are caused by failure to keep or put the demised premises in good repair . . ."); *Harrison v. Taylor*, 115 Idaho 588, 596 (1989) ("a tenant or lessee, having control of the premises is deemed, so far as third parties are concerned, to be the owner, and in case of injury to third parties occasioned by the condition or use of the premises, the general rule is that the tenant or lessee may be liable for failure to keep the premises in repair."); *Steiner Corp. v. American Dist. Tel.*, 106 Idaho 787, 791 (Idaho 1984) (a supplier does not have "any common law duty" to maintain or inspect equipment provided to his customer). In other words, where property is leased, ownership alone is not sufficient to create a duty of care.

To hold a landlord responsible for the conditions of leased property, a plaintiff must show that "the landlord created the hazard him or herself." *Stiles*, 160 Idaho at 534. For example, it is well-settled under Idaho law that a landlord owes a duty of care to lawful entrants onto a leased property to use ordinary care in performing any maintenance obligations that the landlord voluntarily undertakes, whether under the terms of a lease or otherwise. *Id.* (where a landlord creates a hazard, it may be liable "to a third party for injuries resulting from negligent repairs or failure to repair"); *Harrison*, 115 Idaho at 596 ("Even in the absence of a specific lease provision, and with no controlling statute requiring him to make repairs, if a landlord voluntarily

**MEMORANDUM DECISION AND ORDER - 15**

undertakes repairs he is bound to use reasonable and ordinary care or skill in the execution of the work."); *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 300 (1990) ("A landlord, having voluntarily provided a security system, is potentially subject to liability if the security system fails as a result of the landlord's negligence.").  Taken together, these cases teach that either a business tenant, or a landlord, or both, may be liable to a third party for injuries resulting from negligent repairs or failure to repair, depending on who had responsibility for the faulty maintenance.  *See Harrison*, 115 Idaho at 596.

To the extent Plaintiff is arguing otherwise and is seeking to hold Defendant liable for the entire maintenance of the winch, irrespective of the terms of the Lease, this argument is without merit.  Idaho law is clear that Defendant did not have a free-standing duty, as the owner of the winch, to continue maintain the winch once it was leased.  *Stiles*, 160 Idaho at 533-534 and *Steiner Corp.*, 106 Idaho at 791.

As the Court understands it, Plaintiff implicitly recognizes that this was so.  While Plaintiff's supplemental brief contains some broad language suggesting that the terms of the Lease are immaterial to Defendant's duty of care, Plaintiff ultimately insists that Defendant had a duty to Plaintiff because "[t]he responsibility for the inspection and maintenance of [the winch] system was not transferred to IDPR as part of the Contract, but remained with the [ACOE.]" Pl.'s Supp. at 4-5 (Dkt. 71).

The problem with this argument is that it is factually incorrect.  As already outlined in detail, the Lease unequivocally transfers certain maintenance responsibilities to IDPR, while leaving other responsibilities with Defendant.  For the direct maintenance responsibilities that Defendant assumed under Paragraph 44(b) of the Lease, the Court agrees that Defendant had a

duty to the general public and to winch operators to timely and safely fulfill these obligations. *Harrison*, 115 Idaho at 596.[8]  This is the basis of Plaintiff's failure to maintain claim.

The question presented here is whether Plaintiff can also present a second claim at trial seeking to hold Defendant liable for negligently overseeing IDPR's performance of *IDPR's* maintenance obligations under Paragraph 44(a) of the Lease.

Every Idaho court to have considered whether voluntarily undertaking such oversight gives rise to a duty of care to third-parties has held that it does not.  *See Bowling v. Jack B. Parson Cos.*, 117 Idaho 1030 (Idaho 1990) (a shareholder did not assume a duty to an employee of a subsidiary by undertaking safety inspections at the subsidiary's worksite) and V*ickers v. Hanover Constr. Co.*, 125 Idaho 832, 835 (Idaho 1994) (an owner and general contractor's retention of the right to inspect a construction site was "not sufficient to create a duty" to the workers at the site).  These cases recognize and apply the well-settled rules that people generally owe no affirmative duty to assist or protect another and that "mere nonfeasance" of contractual obligations, therefore, even where willful, are generally insufficient "to support an action in tort based on a breach of contract."  *Steiner Corp.*, 106 Idaho at 790.

The Idaho Supreme Court has only recognized one limited exception to this principle. Where (i) a company contracts to perform a primarily safety-related service, (ii) third parties are affirmatively relying on the continued performance of the service, and (iii) it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking, a contract may create a duty of care to those relying on the performance of the contract.  *Baccus v. Ameripride Servs.*, 145 Idaho 346, 351 (2008) (holding that a defendant who contracted to replace the safety mats out at an employer's facility owed a duty of care to an employee who

---

[8] Notably, Defendant has never argued otherwise.

**MEMORANDUM DECISION AND ORDER - 17**

slipped and fell because the defendant failed to put out mats as contractually promised). Affirmative reliance is a critical element of such claims.  For a duty of care to arise, the defendant's omission must result in more than a mere failure to eliminate a preexisting risk, which is not actionable in tort.  *Baccus*, 145 Idaho at 352.  To be actionable, omissions of contractual duties must actively increase the risk of harm to a party relying on the performance of the contract.  *Id.*  In *Baccus*, for example, the defendant's failure to replace the safety mats actively increased harm to the employees in the building because the mats had been routinely placed at the entrance prior to the contract and if defendant had not entered the contract someone else would have been hired to fulfill this safety function.  *Id.*

Although Plaintiff discusses the facts and holding of *Baccus* in his supplemental brief, Plaintiff does not assert that a similar duty arises here.  Nor would such an argument be successful.  The Court agrees with Defendant that the facts of this case are much more analogous to *Vickers* than to *Baccus*.  *See* Def.'s Suppl. At 3-5 (Dkt. 72).

First, Plaintiff has not shown that Defendant's promise to periodically inspect the docks to ensure IDPR was performing its required maintenance was a "primarily" safety-related service, rather than an avenue for Defendant to protect its property interests.  The plain language of the Lease refutes this conclusion.  *See* Lease at 65 (Dkt. 25-11) (stressing that Defendant "will not be responsible . . . for lack of required routine maintenance or negligence by the lessee").

Second, even if Defendant's obligation to conduct inspections under Paragraph 44(a) of the Lease could be considered a safety-related service, Plaintiff has made absolutely no argument that there was any affirmative reliance on this service or, stated differently, that Defendant's alleged nonfeasance of its contractual obligations under Paragraph 44(a) increased the risk of harm to Plaintiff.  *See Baccus*, 145 Idaho at 352.  Unlike *Baccus*, this is not a case where there is any reason to believe IDPR would have hired another company to inspect and oversee its

**MEMORANDUM DECISION AND ORDER - 18**

satisfaction of its maintenance duties had Defendant not voluntarily undertaken to do so for its own purposes.

In both of these ways, and in every other way that matters, this case is indistinguishable from *Vickers*.  In *Vickers*, the Idaho Supreme Court held that an owner's retention of the right to inspect a construction site for compliance with contract specifications was "not sufficient to create a duty" to the workers at the site under Idaho law.  V*ickers*, 125 Idaho at 836.  The same reasoning applies here.  Absent the type of affirmative reliance present in *Baccus*, voluntarily providing or offering incidental safety protections to third-party workers through the oversight of contract compliance does not create a continuing duty of care to affirmatively protect or assist these workers from preexisting risks.  *Id.*; *see also Udy*, 136 Idaho at 390 (a sheriff's practice of voluntarily removing rocks from the highway did not create a duty to protect driver's by consistently removing rocks and debris).  The Court will, therefore, grant Defendant summary judgment on Plaintiff's failure to inspect claim.

3.    *Plaintiff's Failure to Warn Claim*

Plaintiff's final theory of relief is that Defendant was negligent in failing to adequately warn him of the dangers in operating the winch.  Plaintiff's expert asserts Defendant had a duty, as the owner and lessor of the winch, to ensure these warnings were provided.  Passamaneck Rpt. at 4-5 (Dkt. 60-2).

Defendant does not contest that such a duty existed, and the Court will not raise this issue on its behalf.  As it relates to this claim, Defendant's central contention is that the discretionary function exception applies.  Def.'s MSJ at 16 (Dkt. 59-1).

The Court agrees with Defendant that the first prong of the *Berkovitz* test is easily satisfied.  At the December 21, 2021 motion hearing, Plaintiff's counsel made clear that Plaintiff is no longer asserting that any specific statute, regulation, or policy limited Defendant's

discretion about whether or when to provide warnings to winch operators.  Specifically, Plaintiff

has abandoned any theories under EM 385-1-1 and EM 1110-1-400, and Plaintiff acknowledges

that the Lease contains no provisions imposing specific obligations on Defendant regarding

warnings.

The only remaining question is whether Defendant's choice regarding what warnings to

provide is the type of choice Congress meant to protect – *i.e.* is it a choice that is "susceptible to

social, economic, or political policy analysis." *Whisnant*, 400 F.3d at 118.

As Plaintiff stresses, this Memorandum Decision and Order represents the second time

the Court has faced this question.  Defendant first asserted sovereign immunity against Plaintiff's

claims in a motion to dismiss.  *See* Def.'s MTD at 8-12 (Dkt. 25-1).   Because Defendant had not

met its burden to invoke the discretionary function exception, the Court denied the motion to

dismiss.  *See* 3/31/21 MDO at 10 (Dkt. 46).  Plaintiff argues that this decision should not be

disturbed.  Pl.'s Rsp. to MSJ at 6 (Dkt. 60).

Plaintiff's position ignores the highly fact-dependent nature of the discretionary function

exception.  To determine whether the government has met its burden under *Berkovitz*, the Court

must look at "the precise action the government took or failed to take." *Young v. United States*,

769 F.3d 1047, 1054 (9th Cir. 2014) (what is "discretionary" depends on "the precise action the

government took or failed to take").  Here, Plaintiff has narrowed and clarified his failure to

warn claim as the case has progressed.  As outlined above, Plaintiff has abandoned certain

theories of relief.  In addition, Plaintiff has provided more detailed information, in the form of an

expert report, explaining exactly how Plaintiff believes Defendant was negligent.  *See*

Passamaneck Rpt. (Dkt. 60-2).  This report indicates precisely what kind of warnings Plaintiff

claims Defendant should have provided, how they should have been posted or provided, and to

whom they should have been directed.  *Id.*  To the extent this information allows Defendant to

**MEMORANDUM DECISION AND ORDER - 20**

satisfy its burden of invoking the discretionary function exception, the Court has a duty to reconsider it. *See* Fed. R. Civ. P. 12(h)(3) ("if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

This is a complex question. The Ninth Circuit caselaw analyzing when failures to warn are discretionary has not been a model of clarity. *See Terbush v. United States*, 516 F.3d 1125, 1136 (9th Cir. 2008) (acknowledging that Ninth Circuit jurisprudence in this area "may not be in complete harmony"). In some cases, the Ninth Circuit has held that identifying hazards and deciding what warnings are appropriate to address these hazards are susceptible to policy considerations. *See Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (deciding not to post signs warning of the danger of diving off a bridge was immunized because protecting the public from special hazards "involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards"); *Perry v. United States (In re Morales)*, 895 F.3d 708, 716 (9th Cir. 2018) (holding that the government's decision not to warn of a cableway was discretionary even though the decision involved "considerations of public safety); *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994) (where the government was required to adequately warn the public of unmaintained winter trails, decisions as to the precise manner in which the National Park Service would provide these warnings clearly fell within the discretionary function exception); *Terbush*, 516 F.3d at 1136 (holding that the government's failure to warn off the risk of rockfalls caused by a wastewater management system was discretionary). In other cases, however, the Ninth Circuit has held that neglecting to warn of known hazards is not the type of decision Congress intended to immunize. *See Young*, 769 F.3d at 1057 (affirming that a "decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that

the discretionary function exception is intended to protect"); *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994) (same).

Of these cases, the most factually analogous case the Court could find is *Reed ex rel. Allen v. U.S. Dep't of the Interior*, 231 F.3d 501 (9th Cir. 2000). In *Reed*, the plaintiff was severely injured while attending Burning Man, a privately-run festival located on property owned by the Bureau of Land Management ("BLM"). *Id.* at 503. The injuries occurred when a car ran over the tent in which the plaintiff was sleeping. *Id.* The plaintiff alleged, *inter alia*, that BLM acted negligently in (i) approving a site plan for the event that failed to segregate cars from tents and (ii) failing to require the event organizers to warn attendees of the dangers of camping where cars were permitted to drive at night. *Id.* at 504.

The Ninth Circuit rejected the plaintiff's argument that these decisions did not implicate policy consideration and instead involved "garden-variety" calculations regarding "objective" and "technical" safety standards. *Id.* at 506. The Ninth Circuit highlighted that BLM had broad discretion to approve event permits under a land plan that directed BLM to allow "as many recreational opportunities as possible" without causing "undue environmental degradation." *Id.* at 505. The Court reasoned that because BLM had discretion to issue licenses in accordance with these policy principles, the terms of such licenses and "how those terms might be enforced were all discretionary." *Id.* at 506 (stressing that there was only "one discretionary license issued for the event," and finding no need to "explore all the details involved in the BLM's exercise of discretion" in issuing the license).

Similar reasoning applies here. Congress has given the ACOE wide-ranging authority to allow "local interests" and "local governmental agencies" to operate public parks and recreational facilities on its land. *See* 16 U.S.C. § 460d. This statue permits the government "to grant leases of lands, including structures or facilities thereon, at water resource development

**MEMORANDUM DECISION AND ORDER - 22**

projects for such periods, and upon such terms and for such purposes as [the Chief of Engineers] may deem reasonable in the public interest." *Id.* Policy considerations the government must consider in granting such leases include (i) giving preference in the awarding of such leases to "federally recognized Indian tribes and Federal, State, or local governmental agencies" and (ii) allowing inter-governmental leases without "monetary considerations," where appropriate, in recognition of the public service that is rendered by running a public park. *Id.*

The Lease that governs Big Eddy Marina was entered into under this authority. Lease at 51 (Dkt. 25-11). As permitted by the statute, the Lease entrusts responsibility for operating Big Eddy Marina, including the day-to-day adjustment of the docks, to IDPR. *Id.* at 51, 65. In performing these duties, the Lease requires IDPR to comply with "all applicable Federal laws and regulations and with all applicable laws, ordinances, and regulations of the state, county, and municipality where the premises are located, including but not limited to those regarding construction, health, safety, food service, water supply sanitation, use of pesticides, and licenses or permits to do business." *Id.* at 52. The Lease also includes a "Health and Safety" provision that assigns IDPR the responsibility for keeping the premises in "good order and in a clean, sanitary, and safe condition," with the government retaining the right to revoke the lease "for non-compliance" upon the "discovery of any hazardous conditions [on] the premises that present[] an immediate threat to health and/or danger to life or property." *Id.* at 57-58.

Finally, the Lease requires IDPR to affirm that it has inspected the premises, "knows its condition," and is accepting the premises "without any representations or warranties whatsoever and without obligation on the part of the United States to make any alterations, repairs, or additions thereto, unless specifically mentioned elsewhere" in the Lease or specifically agreed to outside the Lease. *Id.* at 53.

**MEMORANDUM DECISION AND ORDER - 23**

Ninth Circuit law is clear that the decision to enter this Lease is discretionary.  *See Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001) (the decision to enter a lease authorizing a tribal corporation to cut timber on BIA land was discretionary).

Like in *Reed*, Plaintiff's failure to warn claim represents a direct challenge to the terms of the Lease.  Specifically, Plaintiff insists that Defendant should have personally ensured manufacturer's warnings were affixed to the winch throughout the term of the Lease, required that the manufacturer's manuals be provided to operators, and strictly supervised IDPR's training program, rather than leaving these decisions to the discretion of IDPR.  Passamaneck Rpt. at 4-5 (Dkt. 60-2).[9]

Undertaking any of these actions would have required a different division of responsibilities and rights than the one articulated in the Lease.  As written, the Lease transfers the winch to IDPR in *its current condition* and entrusts IDPR to (i) safely operate the winch in this condition and (ii), with the exception of structural repairs, keep the winch in a safe condition.  *See* Paragraphs 8(a), 22(a), and 44(a) of the Lease (Dkt. 25-11).  In other words, in entering the Lease, Defendant delegated to IDPR responsibility for appropriately warning and training IDPR's winch operators.  *Id.* ¶¶ 22(a) and 44(a).  Defendant elected to put few restrictions on this delegation, for example, requiring IDPR to abide by federal, state, and local law, but not ANSI or ASME standards.  *Id.* ¶ 7(a).  Plaintiff's failure to warn claim is, in effect, a claim that these terms of the Lease are negligent, and that Defendant should have assumed greater responsibility for warning winch operators about the dangers of the winch, either by

---

[9] As Defendant points out, this claim blurs the line between a failure to warn and a failure to train claim. Def.'s Rply at 2 (Dkt. 67.)  The Court, however, need not resolve how to best categorize each part of the claim or decide whether the failure to train portions of the claim were timely asserted in the Amended Complaint.  However these claims are categorized, the Court's conclusion, and reasons therefor, regarding the applicability of the discretionary function exception remain the same.

**MEMORANDUM DECISION AND ORDER - 24**

retaining direct control over training and the day-to-day condition of the warnings on the winch, or by requiring IDPR to follow pre-determined industry standards in these areas.  *See* Passamaneck Rpt. at 4-5 (Dkt. 60-2).

These claims are barred by the discretionary function exception for the same reason a challenge to the Lease would be.  *See Reed*, 231 F.3d at 506 (where the government has discretion to issue an event permit, the terms of the permits and how those terms might be enforced are all discretionary); *see also Layton v. United States*, 984 F.2d 1496, 1504 (8th Cir. 1993) (reasoning that, where the Forest Service had delegated safety responsibility to a contractor and "where there is no regulatory requirement to issue a warning, the government may decide whether or not to warn persons as a matter of its own discretion"); *Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995) ("Given that the decision to engage [a contractor] falls within the ambit of the discretionary function exception, . . . assertions that the United States was negligent in . . . not posting warning signs cannot prevail because these decisions are embraced by the overarching decision to engage [the contractor].").  The Court will, consequently, grant Defendant's motion for summary judgment as to this claim.

## B.    Evidence of Causation

In addition to the individualized challenges addressed above, Defendant contends that Plaintiff has not produced reliable evidence that the purported lack of maintenance, inspections, or warnings caused the accident that injured Plaintiff's hand.  Def.'s MSJ at 11-12 (Dkt. 59-1).

Defendant is correct that proof of causation is a necessary element of Plaintiff's claims. *Forbush*, 162 Idaho at 322.  Unlike duty or immunity, however, actual causation is usually a question of fact for the fact-finder.  *Fragnella v. Petrovich*, 153 Idaho 266, 272 (Idaho 2012). The Court will only resolve such matters on summary judgment where there is no genuine dispute as to how a fact-finder would decide this issue, i.e., where no reasonable trier of fact

could rule in the plaintiff's favor.  *Id.*; *see also Anderson*, 477 U.S. 242, 252 (1986) (a factual

issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party").  For example, a court may grant summary judgment based on lack of

causation where inferences about causation are not within the common experience of the average

person and the plaintiff has presented "no evidence as to the actual mechanics" of the injury.

*Sanders v. Kuna Joint Sch. Dist.*, 125 Idaho 872, 875 (Idaho App. 1994).

   That is not the case here.  Here, Plaintiff has presented evidence from an engineering

expert, Mark W. Passamaneck, opining that the lack of inspections, the corroded condition of the

winch, and the lack of warning signs and labels, "directly caused" Plaintiff's injuries "to a

reasonable degree of engineering certainty." Passamaneck Rpt. at 5 (Dkt. 60-2).

   Defendant lodges several attacks on the credibility and reliability of this expert, including

pointing out that Mr. Passamaneck did not view the winch until three years after the accident and

did not attempt to reconstruct the accident.  Def.'s Rply at 4-6 (Dkt. 67).  However well-founded

these challenges may or may not be, they are misdirected.

   To the extent Defendant is arguing that Mr. Passamaneck's testimony is inadmissible

under Federal Rule of Evidence 702, the proper approach was for Defendant to file a motion to

strike or exclude Mr. Passamaneck's testimony.  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286,

1288 (11th Cir. 2005) (affirming a grant of summary judgment on grounds that plaintiff failed to

prove causation after the plaintiff's expert was excluded under *Daubert*); *Cortes-Irizarry v.

Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("The *Daubert* regime can

play a role during the summary judgment phase of civil litigation. If proffered expert testimony

fails to cross *Daubert's* threshold for admissibility, a district court may exclude that evidence

from consideration when passing upon a motion for summary judgment."); *Pyramid Techs., Inc.

v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (2014) (same).  Defendant, however, has elected to

**MEMORANDUM DECISION AND ORDER - 26**

delay such a challenge for trial.[10]  Given this decision, the Court must assume for the purposes of ruling on this Motion that Mr. Passamaneck's testimony is admissible.

That presumption is fatal to Defendant's argument.  "After an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Pyramid Techs.*, 752 F.3d at 814.  In other words, unless and until Mr. Passamaneck's testimony is excluded from evidence, the Court must accept that testimony as true for the purposes of ruling on Defendant's motion for summary judgment. *Id.*  This testimony creates a genuine issue of material fact regarding whether Defendant's alleged negligence caused Plaintiff's injuries.

## **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that

1. Defendant's Motion for Summary Judgment (Dkt. 59) is DENIED in part as follows:

    a. There are genuine disputes of material fact regarding the scope of Defendant's maintenance responsibilities under Paragraph 44(b) of the Lease.  Defendant's motion for summary judgment is DENIED in this respect.

    b. There currently exist genuine disputes of material fact regarding whether Defendant's alleged negligence caused Plaintiff's injuries.  Defendant's motion for summary judgment is DENIED in this respect.

---

[10] Defendant's reply makes one passing reference to Rule 702, but does not develop any challenge under this Rule with sufficient detail to preserve the issue for the Court's review. Def.'s Rply at 5 (Dkt. 67).  In addition, at the December 21, 2021 motion hearing, defense counsel indicated that the government was intentionally asking the Court to rule on summary judgment before raising *Daubert* challenges.

**MEMORANDUM DECISION AND ORDER - 27**

    c.   As a result of these rulings, Plaintiff's claim that Defendant was negligent in performing its maintenance obligations under Paragraph 44(b) the Lease will proceed to trial.

2.   Defendant's Motion for Summary Judgment (Dkt. 59) is GRANTED in part as follows:

    a.   Plaintiff has not shown that Defendant had a duty under Idaho law to conduct sufficient inspections to ensure IDPR was performing its maintenance obligations under Paragraph 44(a) of the Lease.

    b.   Plaintiff's failure to warn claim is barred by the discretionary function exception.

    c.   The Court, therefore, will dismiss the failure to inspect and failure to warn claims with prejudice.

DATED: February 22, 2022

Raymond E. Patricco
U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 28**